Mr. Lombanac, when you're ready. Good morning, may it please the court. At its core, this case is about holding the board legally accountable when it pursues claims for and fines violations of the National Labor Relations Act based on an employee's discharge. The board's general counsel filed the underlying complaint against Capstone alleging that Joyce Henson was discharged for protected concerted activity. At trial, counsel for the general counsel, sole theory was that protected concerted activity that Ms. Henson engaged in was complaining about pay and complaining about safety to Capstone's management and to the management of Capstone's customer, AWG. The judge rejected the theory. The judge found that Henson was discharged because of a specific instruction or a specific interaction she had with AWG's director, Chris Griffin. But the judge found no reliable evidence about what that interaction involved. Consequently, he dismissed the complaint and found the general counsel failed to meet her burden of proof. A three-member panel of the board adopted the judge's credibility findings, but incredibly, the panel manufactured two independent reasons for finding the discharge unlawful. Neither of those reasons was litigated below, and neither of those reasons is supported by substantial evidence on the record as a whole. The first reason was that Ms. Henson was supposedly discharged for this LinkedIn message she sent to Donnie Rouse. Donnie Rouse is the owner of Rouse's Market, which is AWG's largest customer. So we're talking about a customer's customer. The board also found in the alternative that Vice President of Capstone, Tim Casey, discharged Ms. Henson because he believed she engaged in protected concerted activity. Again, neither of those issues was litigated fully and fairly below, yet the board found this to be reasons for upholding the discharge or finding the discharge unlawful. The first point— You have more, perhaps, salient arguments than the one I want to focus on. You mentioned the customer of a customer. If you go back to Eastex itself, it's nothing at all like what we're talking about today. And if efforts to contact the members of Congress can be covered by the NLRA, it seems to me customers of customers is even closer to the company. But make whatever arguments you want to, but I would move on from that one. Certainly, and I will move on because there are—obviously, there are stronger arguments, including animosity, which I want to get to. But I do want to just point out Eastex does not go, as we've argued, as far as the board contends it does, and there's very good reason for it, especially in a staffing arrangement like this. The customer's customer does not have a direct impact on the primary employer. So when you think about things that are prohibited within the National Labor Relations Act, such as secondary boycotts, things of that nature that are too attenuated to have a direct impact on an employee's terms and conditions of employment, that is why Eastex, we argue, doesn't go that far, and that is why we submit the board was unable to find a single case involving a complaint to a customer's customer, nor were we able to find a case involving a complaint to a customer's customer being protected or unprotected, but that's our position that Eastex goes that far. A case now exists, and we have to decide whether it's protected or unprotected. That's right, and that is, Judge Southwell, that is the first step, but of course, just because protected concerted activity is involved, there are two—obviously, two other important elements, one being knowledge and two being animus, and I want to first focus on animus. Both of the board's findings regarding the LinkedIn message and Mr. Casey's belief about Ms. Henson's actions are premised on an absolute incorrect assumption that Mr. Casey exhibited animus by instructing her not to bring complaints to AWG, okay? This was an egregious error. This court has squarely recognized in both the Brown and Root versus NLRB case in 2003 and again in NLRB versus Arkema in 2013 that the board cannot establish animus based on lawful employer conduct, and that is precisely what happened here. Tim Casey, the decision-maker for Capstone in this case, had very good reason to tell Ms. Henson not to take her complaints and concerns to AWG, the customer. Mr. Griffin, who worked for AWG as the director, specifically complained to Mr. Casey, they're bringing—these Capstone auditors are bringing complaints and concerns to us as AWG. They need to know that they're supposed to go to Capstone management, okay? He also said that Ms. Henson had come in and said she didn't know who she was supposed to report to. Mr. Casey testified that that's not uncommon in the staffing industry, and particularly in a situation like this, which was new at the AWG facility. That is why he told Ms. Henson, don't go to AWG with your complaints and concerns. But the board wants this court to believe that this is like those other cases in which the board says it's unlawful to tell employees they can't go to third parties with their concerns. It was imperative that Ms. Henson know and understand who her Capstone managers were because of, obviously, joint employer concerns. And this case perfectly illustrates that because the general counsel raised and litigated a joint employer theory to bring AWG into this case. The board never found that. The judge never found that. It's not part of this appeal. But it illustrates why it's so important in a case like this to understand why that instruction was given. But aside from all of that, the instruction was lawful. The board recognizes no unlawful conduct. It was not alleged to be unlawful conduct by instructing her not to bring her claims to AWG. Because AWG complained. Now had they not complained, had they simply come and said, y'all, you're not doing what you need to do for Henson. You need to do a better job. Please do a better job. That would not be the same thing, right? Well, in addition to complaining, Mr. Griffin, AWG, told Capstone she doesn't know who she's supposed to report to. Right. That said, don't come to me. But if instead he said, I'm so glad she came to me because I think she's wonderful and you guys are messing up and you need to fix it and la la la, and had basically taken what she said and tried to get Capstone to fix it, that would be a different case, right? Presumably. Yes. Okay. Yes, Your Honor. Your point is they don't want her to keep bothering somebody who doesn't want to be bothered, who doesn't work for them. And so they're explaining to her, come to us, here's who we are, la la la. Don't go to Griffin because he doesn't want you. Right. And not just for the sake of it, but again, there are legal implications in a staffing relationship with a third party such as AWG, who the Capstone labor service provider is doing the work for, to not be in control, to not direct, to not be the entity that an employee goes to with complaints that only Capstone can. Yeah, but I mean, I think Henson thought by going to, well, to Rouse's, who can tell AWG, who can tell Capstone, it gets them more likely to do it because if you have somebody who's like a bunch of money in your bucket and they're saying you're not treating Henson right, they're much more likely to be concerned about that than just Henson saying, I want more money. Correct. Okay. And so that's the point that I'm trying to make is trying to understand the differences that go across the line. Right. But again, you know, backing up to its core, though, that the issue is a non-starter for animosity, for an animosity finding because it was lawful. There was no question, no dispute that the instruction was lawful. Yet, in no less than 15 instances I counted in the labor board's brief, the board specifically argues to this court that animus is based on Casey's lawful instruction. And they even specifically on page 39 state, the board's animus finding is based on Casey's explicit direction that Henson only take Capstone related issues to Capstone, not to AWG. It could not be more clear that the board's theory here, the linchpin of their case on animus is the lawful instruction by Mr. Casey to Ms. Henson to take her complaints and concerns to Capstone. Again, and that's the most egregious error. I also want to turn to the board's error in finding that Mr. Casey had knowledge of this LinkedIn message. Again, as I mentioned at the outset, this was not litigated. And in fact, this LinkedIn message was not even introduced by the general counsel or the counsel for the general counsel in the underlying case. Capstone at trial introduced the LinkedIn message in order to prove an after-acquired evidence defense that it would have discharged Ms. Henson as a result of that message being disloyal and defamatory. Okay, so from the very beginning, this case had nothing to do with this LinkedIn message. You can even tell from the judge's opinion when he refers to it as a text that he gave little thought or insight into this LinkedIn message being part of this theory. But somehow the board comes up with this novel theory, and whether or not it's protected concerted activity in and of itself to send a LinkedIn message complaining about terms and conditions of employment to a third party like Donnie Rouse, whether or not that is the case, they still board—the labor board has to prove knowledge of that LinkedIn message. And there are numerous cases this Court is well aware of and that we have cited regarding the board's failure to make logical, reasonable inferences based on substantial evidence on the record as a whole, the board's drawing inference upon inference based on speculation and conjecture, and that is 100% exactly what the labor board did here. And we outlined that in our brief, but in short, the knowledge that they use to—or that they infer Mr. Casey had of this message is based entirely on events that happened before the message was even sent. It makes zero sense to find or infer that somebody knew about something before it happened unless, of course, the earlier events contemplated that a message like that might happen or that an event like that might happen. But there's no evidence whatsoever of that. Why did Griffin not testify to the judge? So Mr. Griffin, number one, did not work for Capstone and was an AWG employee and was no longer working for AWG at the time of the trial. And other than that, there's nothing in the record that would demonstrate why he didn't testify, but it is important to point out, and the judge recognized that no adverse inference would be held against the parties for not producing Mr. Griffin. Regardless, Mr. Griffin's—the event that Mr. Griffin engaged in or would have reported to Mr. Henson, that event was told by Mr. Casey at trial. And Mr. Casey's belief, based on that conversation with Mr. Griffin, is why Mr. Casey acted. And that's what was presented at trial. So there was no need to have—bring a customer's, you know, director into that situation. The last issue I want to raise while I have time, Your Honors, is the fact that Mr. Griffin is—the thought that when a board's decision has to be based on logic and reason, substantial evidence on the whole, does it make a bit of sense for a person like Donnie Rouse, the owner of Rouse's Market, to tell AWG—Donnie Rouse, largest customer of AWG—hey, my step—my friend's stepdaughter has issues with Capstone. Okay? She sent me a LinkedIn message. She has issues with Capstone. Okay? Does it make logical sense for AWG to then tell that to Capstone and Capstone to immediately fire Ms. Henson? It makes absolutely no sense because there is no evidence of that LinkedIn message being communicated to Mr. Casey. Mr. Casey testified about why he discharged Ms. Henson. It had absolutely nothing to do with that LinkedIn message. It had absolutely nothing to do with his belief that she engaged in protected concerted activity. And on that last point, that's the secondary point that the board discusses in its decision. The link between Mr. Casey's supposed belief that she engaged in protected concerted activity with Mr. Griffin is based, again, solely on her failure to follow his lawful instruction. And as I've already mentioned, the board cannot rely on that to mesh those two principles up. In addition, there is absolutely no animus whatsoever shown—I understand I'm out of time. May I finish this point? There's absolutely no animus shown here from Mr. Griffin's knowledge imputed to Mr. Casey. Thank you. Good morning, Your Honors. May it please the Court, I'm Greg Lauro for the National Labor Relations Board, asking the Court to enforce the board's order because its findings are supported by substantial evidence on the record as a whole. If I may, because I know there's a lot to talk about this morning, I'm wondering if I can provide a brief frame for this case in our discussion this morning. There is a core of fact here, of factual findings by the board, where even if one could reasonably disagree with that factual finding, we have the substantial evidence test under which the board's factual findings should be affirmed, even if one could reasonably go a different direction. And here the facts we have are that Henson multiple times engaged in protected concerted activity, both at meetings with AWG and Mr. Griffin, like around October 18th, and in meetings with Mr. Casey from Capstone on October 22nd, with her fellow co-workers there, often with their participation or agreement she raised concerns about pay and safety. At some point, Mr. Griffin of AWG complains to Mr. Casey at Capstone, who then instructs her, don't come to anyone except me with your Capstone related complaints. Very shortly after that, she does it again with a LinkedIn message. Mr. Griffin learned about that message, very quickly calls Mr. Casey, who in his own words immediately decided to discharge Ms. Henson, and then reiterated time and time again that was because she violated his directive to only take Capstone issues to Capstone. And on those phone calls... I'm sorry, Your Honor, it was based on... Screaming at Griffin that that's what Henson did. Well, that was the claim, but in addition to the fact that I believe the Board as well supported findings about knowledge of the LinkedIn message, and her long-standing course of protected activity, and strong evidence of animus, it is animus to say when employees undisputably have a protected statutory right to take their concerns to third parties. Your Honor just talked about East Texas this morning, there's not really a dispute about that. It does show animus to essentially say, well, don't do that. And that animus carries over reasonably to the LinkedIn... But not, I mean, the third party doesn't have to sit there and keep listening to it. If the third party says, please tell her to stop talking to us, why can't the company say, please stop talking to Griffin? He doesn't want to hear any more about that. It could be a different case if that's where all he said. But when you look at the facts, and I should add, the timing of the discharge is suspicious. She's engaged in protected activity and they know it. She does it with Griffin. He complains. He notes in part, well, they seem to be coming to me with Capstone issues I can't answer, including possibly pay issues. That's your bailiwick. And Mr. Casey tells her, don't do it again. It's her statutory right to do it again, but he tells her to do it again. I know we always have the fair question, what can an employer do? What they can do is have instructions that don't tell employees not to engage in their statutory rights. And then Mr. Casey made it clear the problem was she had gone to someone other than him with her concerns. He said that time and time again. You violated my directive not to go to others. But employers can't do that. Now my opponent objects, nobody alleged or found that that animus demonstrating directive was itself unlawful. They also say it was a pleasant meeting. That's not the point. The point is employers can't direct their employees not to exercise their statutory rights. And as the board explained, it's of no moment. So what if Griffin said, I will not come back to Capstone if Henson keeps coming and complaining to me. They got to go, oh, well, I guess we're stuck. They can't go to her and say, please don't go to Griffin. Not that those. I mean, that seems totally unfair that they can lose all of their people because their employees can just run around complaining to everyone else and never stop even when the person complained to wants them to stop. Right. It is okay to have reasonable communication rules. It's not okay to have a very broad rule here. And I think that's important. He very broadly said, just come to me. That encroaches on employee statutory rights. What should he have said? Well, I can't write it for him, but he could have said, look, they like you. You're doing a great job. Apparently you and other employers are coming to them with questions they can't answer. I would appreciate it if you come to me with your concerns. I just want you to know he just seems puzzled by it, bothered by it. That may be different, but the point is none of this sanctions directing employees not to engage in their statutory rights. And I think that's a key thing here. And I think it does show animus. Remember, the timing here is also suspicious. Settled law, including from this court, is that it is suspicious and can be evidence of motive, unlawful motive, when you discharge an employee very shortly after they engage in protected activity. And let's look at the timing here that's not really in dispute. After a long course of protected activity in front of both AWG and Capstone directly, here's how quickly things happen on the 22nd. I mean, she's told on the 22nd, don't do it again. She does it again, I think, at about 2.54. By about 3, Griffin, who indisputably knew of the message, is on the phone with Casey. He indisputably knows of what message? Griffin indisputably, the gentleman from AWG, knew about the LinkedIn message by the time he called Mr. Casey about how— It's indisputable. I don't actually see any evidence at all of it. It's circumstantial. So why do you call it indisputable? I call it indisputable because it wasn't disputed before the board. Not only did Capstone decide not to challenge the judge's finding that Mr. Griffin knew, it specifically told the board that they weren't making that claim. I call it indisputable because it wasn't disputed. Well, you said undisputed, not undisputable, it seems to me. Fair enough, Your Honor. Because it does seem to me it's a stretch. I will take undisputed. Well, I'm not just worried about semantics here. It does seem to me a stretch, circumstantially, that all that would have happened that fast, what little I know of LinkedIn and how quickly Donnie Ralph, CEO, would have been looking at a LinkedIn account and responding. So if it's undisputed— Right. Your Honor, I think the point is, if I may— How important is this message? How important is it to the board's decision that AWG and Capstone became aware, were told by Donnie Ralph that this woman sent me this message? How central is that to the holding? It is an important part of the finding that the discharge was unlawfully motivated. Now, I will grant you there's a lot of other protected activity close in time to the discharge, and that can be circumstantial evidence of animus. But the board's finding, and it's well-supported, that there's strong circumstantial evidence that the discharge was unlawfully motivated by her protected, concerted activity in sending that LinkedIn message. And there's strong circumstantial evidence showing Capstone's knowledge of that activity. And I think that something else that should be pointed out here, because I think that supports the first step of right line, finding a motive. At the second step, not only does Capstone have no evidence to support their affirmative defense, what they did raise, the board noted, shows what we call pretext. You have no credited evidence that she engaged in the misconduct you claim you discharged her for during that meeting with Mr. Griffin on the 22nd. You don't even have credited evidence that that report happened. That report's extremely vague. You didn't investigate it. You didn't even ask Mr. Griffin exactly what happened. You didn't ask Ms. Henson what happened. You engaged in a cursory investigation. You departed from your own practice by not giving her a contemporaneous written reason for the discharge. And then before the court, they shift explanations and say, you know what else? We could have fired her for the way she acted the day after we discharged her. But it stands to reason that proof of your motive at the time of the discharge, that you actually would have fired her at the time you discharged her, isn't proven by what happened the next day. And I think when you pull it all together under the substantial evidence test, there's a reasonable basis for a finding of motive. And I'm happy to answer any questions about that, but I do think I should address one thing. My opponent argues that they felt ambushed, I would say, by the board's reliance on the LinkedIn message as protected concerted activity at all and the very idea that it's something to do with the discharge. That's not quite so. As they do note, they introduced it. I thought they said in their reply brief that they introduced it because they thought it showed that that message wasn't protected concerted activity. But here's what happens that shows the issue was litigated. The judge, he agrees in some ways with my opponent's position and says, that LinkedIn message doesn't look like protected concerted activity to me. But he gets that the LinkedIn message is part of the argument. Then the issue is litigated further. The general counsel accepts to the judge's decision, specifically arguing the judge was wrong about that one thing. That message is protected concerted activity. There's sufficient circumstantial evidence that that was a motivation for the discharge and Capstone litigates it and says, we disagree with that. Now, they didn't say, oh, and by the way, we're surprised. But I think the kicker here is if they were truly surprised by the board's theory, then you would have to accept the premise that after the board's decision would be the first time to raise your hand and say, I was surprised, like in a motion for reconsideration. They didn't do that. And I kind of think that means the gig is up. They weren't really surprised or they didn't claim they were. They raised this ambush argument for the first time in their reply brief. They don't even raise it in their opening brief to this court. And arguments not raised in an opening brief are usually waived. And arguments that aren't presented to the board when you have the opportunity, like in a motion for reconsideration, are typically jurisdictionally barred by statute. Okay. Now, what case do you have under 29 U.S.C. 158, you know, that arena, in which somebody complaining to somebody who is a, is somebody who uses X and X is not X and X then uses Y, and you're complaining about Y. Why, what case do you have that says that is part of this rule, part of this statute? Meaning just so I'm on board, the customer's customer issue as to the quality of? I guess that's a good way to phrase it. Customer, customer. Sure. Well, one, as Your Honor's noted this morning, there's East text, which I would agree, sets it broadly. You can petition to third parties, customers, other cases, say even the public, and it begs the question, if you can go to the public, by definition no particular connection to your employer, but you can appeal to them and hope to get some pressure for change, then why is it less connected, my opponent says, too attenuated, to go to someone like Mr. Roos, following the money, frankly, who has a vested interest in AWG's facility, can lean on AWG, who can lean on Capstone. It's actually, as we've pointed in our brief, probably more connected than the appeal that was protected in East Act, where I believe talks about appeals to the legislature and where the employees there were already making a minimum wage, but the protected message was support a minimum wage bill. And I should say, Your Honor, this comes down to a factual issue. When you look at the LinkedIn message itself, do you see substantial evidence that this is protected and concerted? My opponent argues it's not concerted at all, that any connection to the group, the other auditor's concerns, is an afterthought, barely noticeable, except when you look at the text, it's not barely noticeable. She's, and it's connected to her prior concerted activity. She says, we met with Capstone earlier today, and we were misinformed, quote, my auditors were misinformed about their pay rate, and she specified the difference between what they were promised and what they were getting, and she implicitly requested assistance by saying here's the contact information to help me out. That is a clear, protected, concerted appeal, and you have to ignore the text of the message itself to find otherwise, but at a minimum, substantial evidence supports the board's finding that's protected and concerted, that Capstone knew about it, that there was animus. It seems to me that as important as Rouse is to the customer, for Capstone to fire this employee who this extraordinarily important customer has passed on the message from Donnie Rouse, it seems backwards. It doesn't seem like Capstone would fire the person if that's actually what happened. They would try to mollify the person, because else they'd lose AWG as a customer by interfering with Rouse. I mean, it's just, it's circumstantial evidence, and if indeed they have not disputed it, that's a different matter, the knowledge, but it really doesn't compute very well to me that that's what would have happened, and yet that's what the board found, and I'm not sure there's substantial evidence to support it, but we'll have to decide that. Do you have any reaction? Is it, in fact, if somebody as important to Capstone as AWG is told that somebody very important to AWG has passed this along, why would they fire the person? Your Honor, sometimes even where substantial evidence supports a finding of unlawful motive, it's not always the case it makes business sense. What we know is they knew of her protected activity. Mr. Griffin knew because she told him of her connection to Mr. Rouse, and apparently it made him a little nervous. He complains to Mr. Casey about Mr. Rouse, noting she knows him. She's directed, don't engage in protected appeals to third parties again. She does it again. She's quickly fired, with Mr. Casey acknowledging it's because she violated my directive not to reach out to third parties, and then he states that motive again and again. At a minimum, even if one could pose an alternative theory, like why would the company do that? Does it make business sense? The question is, is the board's factual finding of motive reasonable and supported by substantial evidence on the record? How reasonable is that finding? Excuse me, sir? That's what I was addressing. How reasonable is that finding? I think it's a very reasonable finding. A reasonable mind could reach that conclusion based on the evidence we've discussed. There's no record evidence viewed as a whole compelling the opposite conclusion. I think that's what we're talking about with the standard of review. We can come up with alternative theories, which is what my opponent attempts to do, but at each case, animus, knowledge, protected concerted activity, a moffle motive, which can be supported by circumstantial evidence. Why does she want to work for this company? She said, it's the worst company I've ever worked for. She hates it. She hates the lack of money and all of that. Why is she wanting to go back? A couple of things. She had worked for them years before, and apparently they liked each other, so she had the opportunity to be a lead auditor. Again, they liked her. They made her the lead auditor. They certified her to train other employees. They told her, keep up the good work, and there could be opportunities for promotion. She was disappointed in the lack of wages, and she did start her protected concerted complaint with a general complaint about her employer, but she quickly moved to raising the protected concerted concerns of her group, my auditors, and their wages, and it's not unprotected just because she said something negative about the employer. Now, I will point out, and I think this is covered in our brief, the disloyalty claim they raised was not raised to the board. They had the opportunity. It's barred under Section 10E, but I think it's also meritless because it's not anything like the cases they cite. Actually show what she did was protected. She focused on a protected concerted complaint. She wasn't engaging in malicious falsehood or defamation or anything serious, and when you look at the cases they cite, I mean, it's someone in the board actually used this language that did something very immature by sending a silly quiz to a confidential client list and saying something like, should monkeys wear jeans? I mean, we just don't have something like that, where another case involved, I think, like a conspiracy and an attack on a particular supervisor. We just don't have those cases, but of course the court need not go there because that claim, if you mean the kind of issue of wasn't she disloyal, wasn't raised to the board. But, Your Honor, again, it's the board's position that even if reasonable minds could disagree as to these factual findings, we have a tight factual case here, substantial evidence supports the board's view. Well, if we just issued a one sentence, okay, we affirm, what's going to happen? What interaction is she going to have when she comes back? How is it going to even work out? Because there's still, there's no obligation that they pay her more than the minimum required by law, right? Right. The board has a remedy, and there would be compliance, and she would have her rights protected. I mean, by enforcing unfair labor practices, you send a message to that discriminatory and other employees, their rights will be protected. You do have a right to go to third parties. When you're discharged, you do have a right to reinstatement. That would be worked out at the compliance stage, and it's something that really matters to fulfill the Act's promise to employees. Thank you, Your Honors. I see I'm out of time. Your Honors, as you can see, the board doubles down on its position that Animus is based on Mr. Casey's lawful instruction to Ms. Henson not to take her concerns to AWG. Which is not, you know, if they're wrong at all, they're not completely wrong. It does seem to me that the board is correct to say that an employee can take his complaints to somebody outside of the chain of command, including to a customer. And you talk about customer. A customer, put that aside. And what she was told is don't do that. We got into hypotheticals of how it could have been done better, but it does seem to me that an outright prohibition of taking complaints to somebody out of the chain of command is a violation. Well, Your Honor, that was not alleged. It was not based on the evidence what was given to or the instruction that was given to Ms. Henson. And so we're not even at a place where, you know, the potential for it to be unlawful could give rise to an inference of animosity because it was never presented, never alleged, and never found to be unlawful. And for good reason, as I mentioned earlier, regarding the relationship between AWG. I guess I'm not following what you're saying. The board makes these allegations that that prohibition shows animus. And 15 places in their brief or whatever you told me before, they return to that. So what are you saying now? What I'm saying is that it cannot be animus because it's not unlawful. And that's what Brown and Root and the Arkema case hold. And those cases have actually rejected the board's finding in board law where the board does consider and will consider evidence that's not unlawful. So employer conduct statements, usually in the form of statements that are against union interests, you know, anti-union type statements that are not unlawful. The board will find that as background evidence. However, this court has specifically rejected that theory. One quick point on timing, if I may. Of course, the timing is suspect. The behavior, which Mr. Casey attributed to Ms. Henson, happened and was reported to him, and then he took action. This court and the board has always recognized that timing alone is not sufficient to demonstrate unlawful motivation. Indeed, there's no way it could, or else anybody who engaged in any sort of protected activity, along with unprotected activity, would not be able to be discharged right away, lest timing be an issue. So that's a nonstarter issue. The board's findings have to be based on substantial evidence, as the board recognizes and as my opponent has fairly represented here. The issue here, though, is that it is not, number one. And number two, the board failed to look at the record as a whole and consider those elements, which I believe this court has recognized throughout our argument today, fairly detract from those findings. And that's another key component to the standard of review. And the board did not do that here. Not only did it essentially ignore the judge's findings and conclusions, which were reasonable, but the board took it on itself, on its own, to find the LinkedIn message and the belief of Mr. Casey to find that. And, I mean, there's no right to go and scream at the third party. That was what was the problem, as I understand it. It wasn't just that you walked up and said, I'm still not getting the money I need, and can I talk to you a little bit, Mr. Griffin? Instead, you're like, Mr. Griffin! That's the claim. Now, I understand she may disagree, but that was what Griffin told Casey, right? And I don't see that there's any right to go around screaming at third parties that are customers of your employer. Right. Of course not. And the board doesn't extend protection that far. And that takes me to a final point raised in our brief along the lines of the after-acquired evidence issue. Even accepting the animosity and the motivation for the discharge, her conduct when she returned the next day, which was reflected in Mr. Griffin's message, again, another message that Mr. Griffin sent, was unacceptable, and she was not allowed to come back onto property per Mr. Griffin. And so all of this in our position is merely academic because of that issue. Like you said, if she's going to come back to work, how can she possibly, you know, what is she supposed to do if AWD doesn't want her there? So thank you for your time, Your Honors. All right, counsel. Thank you. And to the board attorney for your assistance in our understanding of this case. We'll take it on advisement and we will take a brief break.